D. Z. SEDAM v. CINCINNATI AND WHITEWATER CANAL CO. ET AL.

(No. 4,194.)

1. Where a canal company, in pursuance of a written agreement, transfers to a contractor all its cash on hand, and agrees to transfer to him all future revenues of the canal, sufficient to cover the cost and expense of an aqueduct, forthwith to be constructed by such contractor, the moneys so transferred and standing in bank to the credit of such contractor to enable him to make the canal improvement, cannot be diverted by a judgment creditor of the canal company to the satisfaction of his judgment.

2. The mere fact that the canal company is suffering from financial embarrassment, and that its moneys were so transferred to insure the needed repair being made, and to prevent judgment creditors from retarding the

improvement, by levying on its funds and revenue, will not prejudice the rights of the contractor, nor add force to the rights of its judgment creditors.

3. An equitable assignment by a canal company, of all its moneys in hand, together with future tolls and revenues, for the purpose of securing a necessary improvement and repair of the canal, will be protected when made in good faith, for the benefit of the public improvement.

GENERAL TERM.—Reserved from special term upon the pleadings and testimony.

The plaintiff being a judgment creditor of the Cincinnati and Whitewater Canal Co., filed a creditor's bill to subject a fund which, it is alleged, was deposited in the Mechanics' and Traders' Bank, in Cincinnati, and held there for the use of the Cincinnati and Whitewater Canal Co., in reality, though standing in the name and to the credit of Clement Dare. It is averred that the purpose to be accomplished by the canal company in thus arranging the deposit, was to prevent its creditors from reaching it, the corporation being insolvent.

The canal company, the bank, Dare and C. W. West, who is also a defendant, severally answered, denying fully the allegations of the bill.

Much testimony was offered, as well by depositions as by the official acts of the canal company, both as they appear by its records, and by the contracts authorized to be made by its directors.

It was in evidence that more than a year before the plaintiff's bill was filed, the canal being out of repair, the aqueduct over Mill creek requiring to be reconstructed, at the estimated expenditure of some $40,000, the canal company on March 15, A. D. 1852, passed the following resolution, viz:

" *Resolved,* That the president be authorized to contract with Clement Dare to build a stone aqueduct across Mill creek, and also a wooden towing path bridge across the Miami river; and upon the execution of said contract, the treasurer is instructed to pay over to said Dare all the money

in hand belonging to the company, to the amount of $40,000, on account of said contracts; the said Dare giving bond and security faithfully to perform the contract and account to the company for the amount received." Thereupon, on March 17th, A. D. 1852, the company and Dare entered into a formal written agreement, whereby Dare agreed " to provide all the necessary materials, boats, tools, machinery and implements; and also all the necessary and proper mechanics and laborers for constructing said work in a good and workmanlike manner;" and the company obligated itself " to pay said Dare the full amount of such cost of said material, boats, tools, machinery and implements, as well as labor, to be paid the said Dare, from time to time, as fast as funds shall accrue in the treasury of said company; and said company also agrees to pay said Dare, on completion of said work, the further sum of five dollars on each and every hundred dollars of said cost, or in that proportion, provided the said per centum shall not exceed two thousand dollars in all; to be paid in like manner out of any funds accruing to said company, after the payment of the cost of said work; and for the payment aforesaid of all the cost and the said five per centum, subject to the limits aforesaid, the said company hereby pledges its funds on hand or accruing until the same shall be fully paid."

Thereupon Dare gave bond in the sum of $50,000, with C. W. West as surety, for the faithful performance of his agreement; entered upon the execution of the same and was proceeding in the performance thereof at the time of the commencement of the present action by the plaintiff.

To carry out the agreement thus made, it was in evidence that the canal company paid to Dare on the 20th March, 1852, $14,851.09, and subsequently other sums amounting in the aggregate to $32,445.27. These sums he deposited in the Mechanics and Traders' Bank, in his own name, from time to time, commencing on the 7th of April, 1852, and ending on the 8th of January, 1853.

The plaintiff's bill was filed on the 2d of June, 1853, and

the summons served upon the president of the bank on the same day, at which time there was on deposit, to the credit of Dare, $21,834, which, it was alleged, ought, in equity, to be charged with the payment of the judgments held by the plaintiff against the canal company.

*Taft & Perrry*, for plaintiff. ·

*King, Anderson & Sage, J. L. Miner and James & Jackson*, for defendants.

STORER, J., delivered the opinion of the court.

We are led directly to the question, who was the real owner of the deposit at the date referred to; and upon its decision in either aspect, as claimed by the parties, the case must depend.

We have been referred to the evidence of the mode in which the canal company had, for several years before the contract with Dare, transacted its business; and asked to regard it as the exposition of their subsequent dealings. The testimony shows the multiplied embarrassments of the company, and the utter inability of her officers, with all the earnings of the canal, to keep the work in repair. Indeed, had it not been for a loan made to the company by the city of Cincinnati, and the sums occasionally advanced by individuals to aid in keeping up the work, it is very evident it must have been abandoned. There were numerous debts, long past due, unprovided for; and creditors were pressing them for collection. The company of course had lost all credit, and could not procure materials for repairing the work, nor laborers to execute it, except by prompt payment in cash; while the stone or the timber provided for the repairs were not only exposed to execution, but had, in more than one instance, been levied on. Hence it seems to have been deemed necessary to keep the revenue of the canal on deposit in the name of the directors and other officers.

Whatever might have been the legal position of the par-

ties in such a state of things, we do not perceive how it can affect the question before us. It was no part of the arrangement between the company and Dare that he should continue any prior trust by a change merely of the trustees.

We must, therefore, inquire what were the terms of the contract of March, 1852. Were its object and purpose fair and just to the general creditors of the company? Had the company the right, by their charter, to make such a contract?

The contract is a direct transfer by way of mortgage of all the funds belonging to the company at its date, as well as of the current revenue of the canal, until a sufficient sum should be realized to discharge the expense of reconstructing the aqueduct. It was substantially an equitable assignment of the monies then on deposit in the hands of its agents, as well as the income of the work from tolls or any other source of revenue. On well established principles, Dare would have been protected in his lien; assuming now that his contract was made in good faith.

The subject of equitable assignment is discussed very clearly in the 2nd volume of Spence's Eq. Jur., ch. 9; the form of the transfer is altogether immaterial, the purpose being once ascertained; and the equity of the assignee being established, the chancellor works out the right, regardless of any technical or merely formal difficulties.

It is said, however, that it was a mere arrangement between Dare and the company to conceal the ownership of its funds, and can not, therefore, be received with any favor by the court.

We find no proof to our apprehension that will authorize such an assumption, except the opinions of some of the witnesses. These are not very clearly expressed, but are intended evidently to create the impression that such was the object, as they understood it from the conduct of the parties; while on the other hand, an equal, nay, a greater number of witnesses, having equal opportunities to know all the facts and in every way of all equal credit, deny the imputation.

But it can not be concealed that it was the intention of the company to secure its funds so that they might be specifically applied to the improvement of the canal; and it is equally true that the object also was, by the contract with Dare, to prevent the seizure of the funds by the several creditors, among whom the plaintiff was specially named. If we grant all this, does it present such a case as is claimed by the counsel who have so ably and thoroughly argued the proposition?

It must be admitted that it was the duty of the directors of the canal company to appropriate its whole revenue to the repairs, and other necessary expenditures of the work. They could not legally make any dividend, or withdraw any portion of their income, to discharge their other liabilities, until they had provided for the payment of those outlays, which were essential to the existence of the canal itself as a public highway; and it would seem that all sums appropriated for such a purpose, might well be regarded as incident to the work itself, and, though not actually incorporated with it, yet for all practical purposes, it was the representative of the improvement to be made. Indeed, a court of equity would, doubtless, compel the directors thus to perform their duty by a substantial execution of the trust they assumed when they accepted their office.

Hence, when the company contracted with Dare, to do what they were clearly bound to do themselves, it was but the transfer to him of the obligation imposed upon them, and as he was necessarily to be responsible for the work which he contracted to do, the means for his indemnity ought justly to follow his contract.

By such a process, although a creditor might be defeated, it can not be said he has been fraudulently defeated. He has, to be sure, lost what he may suppose is one of the legal chances to secure his debt; for he has found in the race of diligence, that his debtors have appropriated to another purpose what he believed he could legally charge with the payment of his own debt; but he is placed in no worse situa-

tion than the creditor is who finds his debtor has preferred another at his expense. Such a predicament is not a novel one; many a creditor has been compelled to occupy it, and that, too, under circumstances of apparent, if not real, hardship; yet it is not to be doubted, but the law sustains the preference when there is no fraud to affect its validity.

In *Bancroft & Caffee* v. *Blizzard*, 13 Ohio, 40, it was held, " if a debtor appropriates his property consistent with the principles of equity and justice, the validity of the transaction should not be impaired, although his intentions are fraudulent; the act is right though the motive may be wrong."

The same principle is very fully affirmed in the late case of *Hoffman* v. *Mackall*, 5 Ohio St. 129.

These decisions are in conformity with the judgment of Lord Abinger, in *Riches* v. *Evans*, 9 C. & P. 640, who held, " the law does not prevent a man from conveying his goods away to avoid a judgment; and the intent to avoid an execution does not make the deed of sale void." And the same ruling was afterward made by Lord Denman, in *Wood* v. *Dixie*, 7 Adolph. & Elllis, N. S. 896.

We suppose the law is settled, as between debtor and creditor, and the question arises whether there was any difference in the relative condition of the parties before us. It is true, Dare was not the creditor of the company, at the time the appropriation of the fund was made, but the obligation of the company to make the necessary repairs to keep up the canal, was, we think, equally within the spirit and intent of the principle. The public convenience demanded that a public highway should be subservient to the purposes for which it was established; and the privilege conferred by law upon the corporation, could be vindicated only by keeping the work in repair.

If, then, the estimated amount of the cost of reconstructing the acqueduct had been paid in advance, and the contractor, for the work to be done, became obligated to complete it, there would seem to be no legal impropriety in the mode, nor any just ground to suspect the *bona fides* of the

parties.   Indeed, it may well be imagined that the work was done cheaper, when the equivalent, to those who were to execute it, could be realized at once and all doubts of ultimate payment removed.   The operatives would certainly labor more cheerfully and steadily when their wages were secured beyond the usual contingencies attending similar improvements; and the interest of the stockholders and the public equally well subserved.

There can be then, no good reason to set aside the contract between the company and Dare, on the ground that it tended to delay or hinder creditors generally, or was intended even to prevent a particular creditor from charging the fund, now in controversy, on execution.

It is claimed, however, that the contract was not made in good faith, but was used as a cover only to enable the company to effect certain objects, inconsistent with the plaintiff's prior right.   The only object that is apparent to us, as pervading the whole transaction, was the reconstruction of the aqueduct, not the immediate benefit of stockholders, but the outlay of the current revenue of the canal to a specific purpose, alike demanded by the necessities of the public, and of all others interested in the work.

In no proper sense can it be said the arrangement thus made, was a fraud upon the plaintiff.   His equity to subject the funds was no higher than the right of the public to its expenditure upon the canal.

There is some testimony tending to prove that when the money was deposited in the bank, as well as when it was paid to Dare, its purpose was to hinder and delay the plaintiff; but it is, we think, to be resolved into the ordinary proposition we have already referred to, that such an intention does not invalidate the act.   And this applies as well to the contract of the parties, at the time the contract was made, as when it was afterward surrendered by Dare, with the assent of the company, in July, 1853.   When that event occurred, the unexpended money in his hands was very properly transferred by Dare to the company's order; but

until then, the contract being in force, his right to retain it, to secure his liability for the construction of the aqueduct, was still retained.

It can not be claimed that the revenues of the corporation could be levied upon, much less could the franchise be sold on execution. In every case where a turnpike company or railroad becomes insolvent and a court of equity has taken the control of the public work, and appointed a receiver to collect revenues, no appropriation is ever made among the creditors until the expenses of keeping up the road are first discharged. Until this is done there is nothing to appropriate, for there is no net income subject to the order of the court.

We can not, then, authorize that to be done indirectly which we could not permit, had we the distribution of the fund and were asked to make an allowance to the creditors, in proportion to their several claims.

There can be no income unless the work is in a condition to earn it, and the idea of revenue necessarily presupposes the reserved right on the part of the corporation to appropriate it, as it accrues, to preserve the integrity of the work itself. Several questions have been raised which, in the view we have taken of the case, are not necessary to be decided. Having arrived at the conclusion that the canal company had not any legal or other claim upon the fund deposited by Dare, with the Mechanics & Traders' Bank, at the time process was served upon it; and being equally well satisfied that, as between Dare and the canal company, he was the exclusive owner of the fund received by him, under the contract to reconstruct the aqueduct, it follows that the plaintiff's bill can not be sustained. It must be dismissed, and an order will be made directing the judge, at special term, so to decree.

Remanded to dismiss action.